**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| FISERV, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: |
| | ) | |
| TERRENCE MONAHAN, | ) | Hon. |
| | ) | |
| Defendant. | ) | |

<u>**VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**</u>

COMES NOW Plaintiff, Fiserv, Inc. ("Fiserv") and for its cause of action against Defendant, Terrence Monahan ("Monahan"), states as follows:

<u>**Introduction**</u>

1.     Monahan is a former Sales Executive of Fiserv Solutions, Inc. ("Fiserv Solutions"), a wholly-owned subsidiary of Fiserv.  Monahan voluntarily resigned his employment with Fiserv Solutions on or about June 30, 2012.  On information and belief, Monahan is now employed by a direct competitor, Jack Henry and Associates, Inc. ("Jack Henry"), and violating the post-employment contractual obligations he owes to Fiserv.

2.     Monahan's disregard for his contractual obligations has damaged and harmed, and unless enjoined, will continue to damage and harm, Fiserv.  Fiserv is entitled to an award of damages as result of Monahan's breaches, as well as injunctive relief enjoining Monahan from continuing to breach his contractual obligations.

## The Parties, Jurisdiction and Venue

3.    Plaintiff Fiserv is a Wisconsin corporation with its headquarters and principal place of business in Brookfield, Wisconsin.

4.    Defendant Monahan is a Michigan resident who resides at 2437 Lost Tree Way, Bloomfield Hills, Michigan 48304.

5.    The amount in controversy, exclusive of interest and costs, exceeds $75,000, to wit, the monetary value of the benefit Fiserv would receive if the injunction relief requested is granted exceeds the sum or value of $75,000.

6.    Venue is proper in this Court under 28 U.S.C. § 1332.

## Background Facts

7.    Fiserv is a leading global provider of information management and electronic commerce systems for the financial services industry.  Fiserv markets its products and services through various subsidiaries and business segments, including Fiserv Solutions.

8.    Fiserv develops technology solutions and computing platforms for over 16, 000 financial companies and institutions worldwide, including banks, credit unions and thrifts, billers, mortgage lenders and leasing companies and brokerage and investment firms.  Fiserv provides information technology services and products in a variety of contexts, including: account processing systems; electronic payment processing services; document and payment card production and distribution; check processing and imaging; source capture systems; financial lending; and risk management.  For its banking clients in particular, Fiserv designs, creates, markets and services banking computing platforms aimed at improving customer service, streamlining office operations, integrating key functions across the client's business (including deposits, loans, customer information and accounting), tracking growth and managing risk.

9.      Fiserv is also the world's leading provider of core bank processing systems for small, medium and large-scale banking institutions.  Fiserv develops, integrates and services software systems that are used to manage the core back-office operations and basic accounting systems for banks, including their loan processing, deposit, teller transaction and internet banking functions.  The functions include but are not limited to tasks such as processing customer deposits, withdrawals and checks, running accounting programs, processing mortgages, inputting and transmitting account information for customers, servicing online access to accounts and other essential tasks.  Fiserv's suite of core bank processing software includes its Premier®, Precision®, Signature® and Cleartouch® banking platforms, which are all available for in-house or outsourced operations.

10.     Fiserv's Premier® system is marketed to mid-sized to regional commercial banks based in the United States that handle assets of up to $20 billion.     Premier® is Fiserv's most popular and widely used core bank processing product, and its target market is banks with a commercial or retail focus.

11.     Fiserv's Precision® system is marketed to small to mid-sized commercial banks based in the United States that handle assets of up to $10 billion.  Fiserv's Signature® system is its most complex core bank processing product, marketed to regional and super-regional commercial banks based in the United States that handle assets of up to $50 billion.  Fiserv's Clear Touch® system is marketed to savings banks based in the United States that predominantly handle savings accounts and mortgages on behalf of their customers.

12.     Fiserv also offers a variety of add-on applications and programs to supplement its core bank processing software in several functional areas, including but not limited to teller applications, platform automation, data warehousing and storage and eCommerce solutions.

## Monahan's Employment with Fiserv

13.     Monahan began working for Fiserv Solutions on or about December 19, 2005. Monahan was hired as a Sales Executive, a position he held throughout his employment.

14.     As a Sales Executive, Monahan's primary job duties included the promotion and sale of Fiserv's Precision® and Premier® core banking platforms to banking clients. Monahan was also responsible for selling supplemental processing applications, which could be bundled with Fiserv's core banking platforms. Monahan was well compensated for his services, receiving six-figure salaries, bonuses, comprehensive benefits packages, and equity payments.

15.     By virtue of his employment, Monahan was privy to confidential, competitively valuable and/or trade secret information regarding Fiserv's core bank processing systems business nationwide. Throughout his tenure, Monahan had intimate knowledge of Fiserv's pricing structures, sales strategies and business plans pertaining to all of its core banking processing suites, including the Premier®, Precision®, Cleartouch® and Signature® platforms. Monahan also had access to critical release dates and rollout plans for future core banking processing products, and received confidential updates and attended round-table discussions regarding Fiserv's current strategies and future plans for its core bank processing business.

16.     Monahan also had access to confidential information pertaining to other areas of Fiserv's business. For example, Monahan was given access to Fiserv's comprehensive competitive products library, which contained comparisons of Fiserv's products with other comparable products marketed by competitors, like Jack Henry. He also had access to product roadmaps, pricing methodologies, expiration dates for client and competitor contracts, and information about client feedback, histories and prospects.

17.     Through his employment as a Sales Executive, Monahan also developed, fostered and maintained valuable goodwill and relationships with Fiserv's customers.  Monahan was responsible for selling core bank processing platforms to small to medium-sized banking clients, and was given an expense account budget used for client entertainment and business development purposes.  As one of Fiserv's leading sales specialists for its check-processing products and solutions, Monahan also developed direct relationships with Fiserv's larger banking clients.

18.     Monahan also had confidential information with respect to Fiserv's customers. As a Sales Executive, Monahan was given detailed information regarding the business portfolios, processing needs and preferences, and product purchasing and service-related histories for Fiserv's core bank processing clients nationwide.  Monahan also had access to Fiserv's Customer Relationship Management database, which gave Monahan access to detailed information regarding past and current sales activities for Fiserv's clients.  Monahan also had access to Fiserv's current and prospective customer databases, and as a key sales employee, he received updates regarding other large business deals occurring within Fiserv.

## Monahan's Contractual Obligations

### *The 2008, 2010, 2011  and 2012 Stock Agreements*

19.     On or about February 27, 2008, Fiserv granted Monahan 49 shares of Fiserv common stock, in accordance with the terms and conditions of its 2008 Employee Restricted Stock Award Agreement (the "2008 Stock Agreement") and Stock Option and Restricted Stock Plan (the "Stock Plan").  A copy of the 2008 Stock Agreement Monahan agreed to is attached hereto as Exhibit A and incorporated herein by reference.

20.     As a condition of receiving the February 27, 2008 stock grant, Monahan was required to agree, and did agree, to the terms of the 2008 Stock Agreement.

21.     In Section 4(a) of the 2008 Stock Agreement, Monahan agreed, among other things, that during the term of his employment, and for a period of 12 months thereafter, he would not, directly or indirectly, on his behalf or on behalf of any other individual, association or entity, as agent or otherwise:

> "(i) contact any of the clients of any Fiserv Group Company (as hereinafter defined) for whom [he] directly performed any services or had any direct business contact for the purpose of soliciting business or inducing such client to acquire any product or service that at any time during the term of this Agreement is provided or under development by the Fiserv Group Company for whom [he] directly performed any services from any entity other than a Fiserv Group Company;
>
> (ii) contact any of the clients or prospective clients of any Fiserv Group Company whose identity or other client specific information [he] discovered or gained access to as a result of [his] access to any Fiserv Group Company's confidential information for the purpose of soliciting or inducing any of such clients or prospective clients to acquire any project or service that at any time during the term of this Agreement is provided or under development by the Fiserv Group Company to whose confidential information [he] had access from any entity other than a Fiserv Group Company;
>
> (iii) use any Fiserv Group Company's confidential information to solicit, influence or encourage any clients or potential clients of any Fiserv Group Company to divert or direct their business to [him] or any other person, association or entity by or with whom [he is] employed, associated, engaged as agent or otherwise affiliated; or
>
> (iv) encourage, induce or entice any employee of any Fiserv Group Company with access to or possession of confidential information of any Fiserv Group Company to leave any Fiserv Group Company's employment."

22.     Monahan further agreed in Section 4(a) of the 2008 Stock Agreement that "damages alone may not be an adequate remedy for any breach by [Monahan] of the covenants or agreements set forth in this Section 4(a) and that the Company, in addition to any other remedies

it may have, shall be entitled to seek injunctive relief, including specific performance, with respect to any actual or threatened breach by [Monahan] of any said covenants and [Monahan's] right to retain any stock under this agreement shall terminate immediately."

23.     On or about February 24, 2010, Fiserv granted Monahan 131 restricted shares of Fiserv's common stock, in accordance with the terms and conditions of its February 24, 2010 Employee Restricted Stock Award Memorandum to Monahan (the "2010 Stock Award Memorandum"), 2010 Employee Restricted Stock Award Agreement (the "2010 Stock Agreement") and 2007 Omnibus Incentive Plan (the "Incentive Plan").  A copy of the 2010 Stock Award Memorandum and 2010 Stock Agreement are attached hereto as Exhibits B and C, respectively, and incorporated herein by reference.

24.     As a condition of receiving the February 24, 2010 stock grant, Monahan was required to agree, and did agree, to the terms of the 2010 Stock Agreement.  See Exhibits B and C.  Monahan agreed to the terms of the 2010 Stock Agreement on April 12, 2010, by electronically selecting the "I accept" box on the website designated by Fiserv's agent, Fidelity. See id.

25.     On or about February 23, 2011, Fiserv granted Monahan 227 shares of Fiserv's common stock in accordance with the terms and conditions of Fiserv's February 23, 2011 Employee Restricted Stock Award Memorandum to Monahan (the "2011 Stock Award Memorandum"), the 2011 Employee Restricted Stock Award Agreement (the "2011 Stock Agreement") and Fiserv's Incentive Plan.  A copy of the 2011 Stock Award Memorandum and the 2011 Stock Agreement are attached hereto as Exhibits D and E, respectively, and are incorporated herein by reference.

26.     As a condition of receiving the February 23, 2011 stock grant, Monahan was required to accept, and did accept, the terms of the 2011 Stock Agreement.  See Exhibits D and E.   Monahan accepted the terms of the 2011 Stock Agreement on April 25, 2011 by electronically selecting the "I accept" box on the website designated by Fiserv's agent, Fidelity. See id.

27.     On or about February 22, 2012, Fiserv granted Monahan 304 restricted shares of Fiserv's common stock in accordance with the terms and conditions of Fiserv's February 22, 2012 Employee Restricted Stock Award Memorandum to Monahan (the "2012 Stock Award Memorandum"), its 2012 Employee Restricted Stock Unit Agreement (the "2012 Stock Agreement"), and its Incentive Plan.  A copy of the 2012 Stock Award Memorandum and the 2012 Stock Agreement are attached hereto as Exhibits F and G, respectively, and incorporated herein by reference.

28.     As a condition of receiving February 22, 2012 stock grant, Monahan was required to agree, and did agree, to the terms of the 2012 Stock Agreement.  See Exhibits F and G. Monahan agreed to the terms of the 2012 Stock Agreement on April 27, 2012**,** by electronically selecting the "I accept" box on the website designated by Fiserv's agent, Fidelity.  See id.

29.     The 2010, 2011 and 2012 Stock Agreements contained, among other things, certain limited restrictions on Monahan's ability to unfairly compete with Fiserv during his employment and after his employment ended.  These restrictions were referenced in bold in Monahan's 2010, 2011 and 2012 Stock Award Memoranda.  See Exhibits C, E and G.

30.     In Section 3(c) of the 2010 Stock Agreement and 2011 Stock Agreement, and Section 4(c) of the 2012 Stock Agreement, Monahan agreed as follows:

"You agree that, without the written consent of the Chief Executive Officer of the Company or, in the case of the Chief Executive Officer of the Company, without the written approval of the board of directors of he Company, you shall not engage in any of the conduct described in subsections (i) or (ii) below, either directly or indirectly, or as an employee, contractor, consultant, partner, officer, director or stockholder, other than a stockholder of less than 5% of the equities of a publicly traded corporation, or in any other capacity for any person, firm, partnership or corporation . . .

(ii)   For a period of 12 months following the termination of your employment with Fiserv, you will not: (A) perform the duties as or for a Competitor, Client or Prospective Client for Fiserv that are the same or similar to the duties performed by you for Fiserv as any time during any part of the 24 month period preceding the termination of your employment with Fiserv; (B) participate in the inducement of or otherwise encourage Fiserv employees, clients or vendors to currently and/or prospectively breach, modify, or terminate any agreement or relationship they have or had with Fiserv during any part of the 24 month period preceding the termination of your employment with Fiserv; or (C) participate voluntarily or provide assistant or information to any person or entity either negotiating with Fiserv involving a Competing Product or service, or concerning a potential or existing business or legal dispute with Fiserv, including, but not limited to, litigation, except as may be required by law."

31.     Section 3(a)(iv) of the 2010 Stock Agreement and 2011 Stock Agreement, and Section 4(a)(iv) of the 2012 Stock Agreement, define "Competitor" as "an individual, business or any other entity or enterprise engaged or having publicly announced its intent to engage in the sale or marketing of any Competing Product or Service."  "Competing Product or Service" is defined in Section 3(a)(iii) of the 2010 Stock Agreement and 2011 Stock Agreement, and Section 4(a)(iii) of the 2012 Stock Agreement, as follows:

"'Competing Product or Service' means any product or service that is sold in competition with, or is being developed and that will compete with, a product or service developed, manufactured, or sold by Fiserv.  For purposes of this Section 3, Competing Products or Services as to you are limited to products and/or services with respect to which you participated in the development, planning, testing, sale, marketing or evaluation on behalf of Fiserv during any part of your employment with Fiserv, or after the termination or your employment, during any part of the 24 months preceding the termination of your employment with Fiserv, or for which you supervised one or more Fiserv employees, units, divisions or departments in doing so."

32.     Monahan also agreed in the 2010, 2011 and 2012 Stock Agreements not to disclose or use Fiserv's "Confidential Information," as that term is defined in the Agreements. Section 3(b) of the 2010 Stock Agreement and 2011 Stock Agreement, and Section 4(b) of the 2012 Stock Agreement, provide, in pertinent part, as follows:

> "During your employment, Fiserv will provide you with Confidential Information relating to Fiserv, its business and clients, the disclosure or misuse of which would cause severe and irreparable harm to Fiserv.  You agree that all Confidential Information is and shall remain the sole and absolute property of Fiserv.  Upon the termination of your employment for any reason, you shall immediately return to Fiserv all documents and materials that contain or constitute Confidential Information, in any form whatsoever, including but not limited to, all copies, abstracts, electronic versions, and summaries thereof.  You further agree that, without the written consent of the Chief Executive Officer of the Company or, in the case of the Chief Executive Officer of the Company, without the written approval of the board of directors of the Company:
>
>> (i)  You will not disclose, use copy or duplicate, or otherwise permit the use, disclosure, copying or duplication of any Confidential Information of Fiserv, other than in connection with the authorized activities conducted in the course of your employment with Fiserv.  You agree to take all reasonable steps and precautions to prevent any unauthorized disclosure, use, copying or duplication of Confidential Information."

33.     Monahan also agreed in the 2010, 2011 and 2012 Stock Agreements that Fiserv would be entitled to injunctive relief if he breached his restrictive covenants contained in the Stock Agreements.   Section 3(d) of the 2010 Stock Agreement and 2011 Stock Agreement, and Section 4(d) of the 2012 Stock Agreement, provide as follows:

> "You acknowledge and agree that compliance with this Section [ ] is necessary to protect the Company, and that a breach of any of this Section [ ] will result in irreparable and continuing damage to the Company for which there will be no adequate remedy at law.  In the event of a breach of this Section [ ], or any part thereof, the Company, and its successors and assigns, shall be entitled to injunctive relief and to such other and further relief as is proper under the circumstances."

34.     Monahan further agreed in the 2010, 2011 and 2012 Stock Agreements that Fiserv would be entitled to recover the value of any bonuses or stock awards he received from Fiserv during his employment, including the stock he received pursuant to the Stock Agreements, if he breached the restrictive covenants in his Stock Agreements.  Section 3(e) of the 2010 Stock Agreement and 2011 Stock Agreement, and Section 4(e) of the 2012 Stock Agreement, provide as follows:

> "You further agree that, in the event of your breach of this Section [ ], the Company shall also be entitled to recover the value of any amounts previously paid or payable or any shares (or the value of any shares) delivered or deliverable to you pursuant to any Fiserv bonus program, this Agreement, or any other Fiserv plan or arrangement."

35.     In Section 3(g) of the 2010 Stock Agreement and 2011 Stock Agreement, and Section 4(g) of the 2012 Stock Agreement, Monahan expressly agreed that the grant of the restricted shares pursuant to the Stock Agreements constituted sufficient and adequate consideration to support his restrictive covenants, and that these covenants were fair and reasonable.  These provisions state as follows:

> "YOU HAVE READ THIS SECTION [ ] AND AGREE THAT THE CONSIDERATION PROVIDED BY THE COMPANY IS FAIR AND REASONABLE AND FURTHER AGREE THAT GIVEN THE IMPORTANCE TO THE COMPANY OF ITS CONFIDENTIAL AND PROPRIETARY INFORMATION, THE POSTEMPLOYMENT RESTRICTIONS ON YOUR ACTIVITIES ARE LIKEWISE FAIR AND REASONABLE."

(Exhibit C, § 3(g); Exhibit E, § 3(g); Exhibit G, § 4(g) (emphasis in originals)).

### *The Sales Equity Plan Agreement*

36.     In 2011, Monahan was also invited to participate in Fiserv's Sales and Bonus Compensation Plan (the "Sales Equity Plan").  In exchange for being eligible to receive equity awards under the Sales Equity Plan, Monahan was required to agree, and did agree, to the terms

of the Sales Equity Plan Agreement.  Monahan signed and accepted the Sales Equity Plan Agreement on or about August 11, 2011, and signed and accepted an amendment thereto on or about August 31, 2011.  A copy of the Sales Equity Plan Agreement, as amended, is attached hereto as Exhibit H and incorporated herein by reference.

37.    As with the 2008, 2010, 2011 and 2012 Stock Agreements, the Sales Equity Plan Agreement contains certain limited restrictions on Monahan's ability to unfairly compete with Fiserv during his employment and after his employment ended.  Section 22 of the Sales Equity Plan Agreement, as amended, provides as follows:

"In consideration for this opportunity to gain ownership in the company through participation in the company's equity plans, Participant agrees that, during his or her employment with Fiserv, and for a period of 12 months following the termination of employment for any reason whatsoever, participant will not: (A) perform the duties as or for a Competitor, Client or Prospective Client of Fiserv that are the same or similar to the duties performed by Participant for Fiserv at any time during any part of the 24 month period preceding the termination of his or her employment with Fiserv; (B) participate in the inducement of or otherwise encourage Fiserv employees, clients, or vendors to currently and/or prospectively breach, modify, or terminate any agreement or relationship they have or had with Fiserv during any party of the 24 month period preceding the termination of his or her employment with Fiserv; or (C) participate voluntarily or provide assistance or information to any person or entity either negotiating with Fiserv involving a Competing Product or Service.

As used herein, "Competitor" means an individual, business or any other entity or enterprise engaged or having publicly announced its intent to engage in the sale or marketing of any Competing Product or Service. "Competing Product or Service" means any product or service that is sold in competition with, or is being developed and that will compete with, a product or service developed, manufactured, or sold by Fiserv. For purposes of these General Terms, Competing Products or Services as to a Participant are limited to products and/or services with respect to which the Participant was involved in the development, planning, testing, sale, marketing or evaluation on behalf of Fiserv during any part of his or her employment with Fiserv, or after the termination of Participant's employment, during any part of the 24 months preceding the termination of participant's employment with Fiserv, or for which participant supervised one or more Fiserv employees, units, divisions or departments in doing so. "Client" means any person, association or entity: (A) for which Participant directly performed services

or for which Participant supervised others in performing services with Fiserv, during any part of Participant's employment with Fiserv; or (B) about which Participant has Confidential Information as a result of his or her employment with Fiserv. "Prospective Client" means any client: (A) with which Fiserv was in active business discussions or negotiations at any time during any part of Participant's employment with Fiserv, or after the termination of his or her employment, in which Participant participated or for which Participant directly performed services or for which Participant supervised others in performing services with Fiserv; or (B) about which Participant has Confidential Information as a result of his or her employment with Fiserv."

38.     Monahan also agreed in Section 22 of the of the Sales Equity Plan Agreement, as amended, that "[i]f any restriction set forth in Section 22 is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend only over maximum period of time, range of activities or geographic area as to which it may be enforceable."

39.     Monahan also agreed in Section 22 of the Sales Equity Plan Agreement, as amended, that Fiserv would be entitled to injunctive relief if he breached his restrictive covenants contained therein:

> "Participant agrees that any breach of Section 22 may cause Fiserv substantial and irrevocable damage and, therefore, in the event of any breach, in addition to such other remedies which may be available, Fiserv shall have the right to obtain specific performance and injunctive relief."

40.     Pursuant to the 2008 Stock Agreement, 2010 Stock Agreement, 2011 Stock Agreement, 2012 Stock Agreement and/or the Sales Equity Plan Agreement (collectively, the "Agreements"), Monahan received a total of 711 shares of Fiserv common stock, valued at over $53,000.

## Monahan's Resignation and Breaches of the Stock Agreements and the Sales Equity Plan Agreement

41.     On or about June 19, 2012, Monahan tendered a resignation letter to Fiserv.  After receiving Monahan's resignation letter, John Bush, Vice President, Regional Sales Manager, and Monahan's direct supervisor, contacted Monahan and attempted to convince him to stay.

42.     Brent Jenos, Senior Vice President, Community Banks and Sales Director, also reached out to Monahan.  Jenos contacted Monahan by telephone, asked Monahan to reconsider his resignation, and also reminded him of his post-employment obligations under the Agreements.  Shortly thereafter, Jenos flew to Michigan to meet with Monahan in-person. During this meeting, Jenos once again tried to convince Monahan to rescind his resignation and reminded him of his restrictive covenants.  Jenos also asked Monahan where he planned to work following his resignation.  Monahan refused to respond.

43.     After learning of Monahan's notice of resignation, Brian Brunner, Division President, Account and Item Processing Solutions, Global Sales Organization, also reached out to Monahan and asked him to reconsider his resignation.

44.     Despite these numerous attempts to convince Monahan to stay, Monahan voluntarily resigned his employment on or about June 30, 2012.

45.     In October 2012, Fiserv learned that one of its prospective banking clients had recently been contacted by Monahan, on behalf of Jack Henry, regarding Jack Henry's core bank processing services and platforms.  Jack Henry is a competitor of Fiserv, in that it provides core bank processing-related services to the same kind of banking clients and also designs and sells similar and competing computing platforms and products.

14

46.     On or about October 20, 2012, Fiserv also received correspondence from a consultant regarding a request for proposal ("RFP") for core bank processing services from another prospective banking client of Fiserv.  Monahan was listed as a Jack Henry contact on the consultant's RFP correspondence.

47.     Upon receiving this information, Fiserv again reminded Monahan of his contractual obligations under the Agreements.  On October 31, 2012, counsel for Fiserv sent Monahan a letter regarding his regarding his restrictive covenants under the Agreements (the "October 31 Letter").   A copy of the October 31 Letter is attached hereto as Exhibit I and incorporated herein by reference.

48.     In the October 31 Letter, Fiserv demanded that Monahan "immediately cease and desist all activities for Jack Henry and Associates, Inc. which violate the agreements to which you are bound."  See Exhibit I.  The October 31 Letter further provided:  "Specifically, if you are involved in any promotional, sales or sales related activities of core bank processing systems on behalf of Jack Henry and Associates, Inc., Fiserv demands that you immediately cease such activities."  See id. (emphasis in original).

49.     In the October 31 Letter, Fiserv also requested that Monahan provide, a "detailed description of your duties and responsibilities at Jack Henry and Associates, Inc. and a detailed description of what you have been doing for Jack Henry and Associates, Inc. since you began employment with them."  See id. (emphasis in original).

50.     On November 2, 2012, Fiserv received e-mail correspondence from Monahan in response to the October 31 Letter (the "November 2 E-Mail").  A copy of the November 2 E-Mail is attached hereto as Exhibit J and incorporated herein by reference.  In the November 2 E-Mail, Monahan stated that he would "stop all sales activities" for Jack Henry until the issues

pertaining to his obligations under the Agreements with Fiserv were resolved. Monahan did not address any of Fiserv's requests to provide substantive information regarding his job duties and responsibilities at Jack Henry. See id.

51.  On November 7, 2012, Fiserv received a request from a potential client inviting it to bid to provide core bank processing solutions. This invitation was also sent directly to Monahan on behalf of Jack Henry.

52.  On November 21, 2012, counsel for Monahan contacted counsel for Fiserv and confirmed that Monahan is not engaging in any sales activities for Jack Henry, pending the outcome of his dispute with Fiserv over his contractual obligations under the Agreements.

53.  On the evening of November 28, 2012, counsel for Jack Henry sent an email to counsel for Fiserv, stating that "Jack Henry intends to place Mr. Monahan back to work" (the "November 28-29 E-Mails Between Counsel for Jack Henry and Fiserv"). A copy of the November 28-29 E-Mails Between Counsel for Jack Henry and Fiserv is attached hereto as Exhibit K and incorporated herein by reference. The following morning, counsel for Fiserv sent an email in response, stating, in pertinent part, as follows:

> As we have discussed on at least two occasions, Mr. Monahan is free to engage in sales activities (or other activities) for Jack Henry, so long as those activities are not the same or similar to the duties performed by Mr. Monahan for Fiserv at any time during any part of the 24 month period preceding the termination of his employment with Fiserv. I have explained Fiserv's position to you several times. Fiserv is principally concerned with Mr. Monahan selling core bank software solutions to new bank clients, and that he might use Fiserv confidential information to unfairly compete against Fiserv. As I understand Jack Henry's business and product offerings, there is plenty Mr. Monahan could do for Jack Henry over the next ten months that would not involve sales activities concerning core bank solutions to new or prospective bank clients. . . .
>
> Please provide a detailed description of what Mr. Monahan will be doing for Jack Henry upon his return, including, specifically, whether he will be selling core bank solutions to new and prospective clients. If it is Jack Henry's plan to return Mr. Monahan to work in the area of core product sales to new or prospective

customers, that is not acceptable to Fiserv, and Fiserv is evaluating the steps necessary to protect its rights concerning the restrictive covenants, including the potential of litigation.

(See Exhibit K).

54.     Counsel for Jack Henry never responded.

55.     To date, Monahan has never provided any information regarding his employment activities at Jack Henry in response to the October 31 Letter.

56.     To date, Monahan's attorney has not provided any response to the October 31 Letter, despite assurance that he would do so during his conversation with Fiserv's counsel on November 21, 2012.

57.     As a result of Monahan's breach of his Agreements, Fiserv has sustained irreparable harm through Monahan's unlawful competition, potential misuse of Fiserv's confidential information and potential abuse of Fiserv's customer relationships and goodwill. Fiserv will continue to sustain irreparable harm unless Monahan is enjoined from breaching the Agreements.  Fiserv has also sustained money damages as a result of Monahan's breach of his Agreements.

## COUNT I

### (Breach of the 2008 Stock Agreement)

58.     Fiserv realleges and incorporates herein the allegations contained in paragraphs 1 through 57 of its Verified Complaint.

59.     Monahan's 2008 Stock Agreement is a valid and enforceable contract.

60.     Monahan has breached and/or threatened to breach the 2008 Stock Agreement.

61.     Fiserv has been, and will continue to be, irreparably damaged and harmed unless Monahan is enjoined from breaching his contractual obligations under the 2008 Stock Agreement.

62.     Fiserv cannot be fully or adequately compensated through monetary damages for the irreparable damage and harm Fiserv has suffered and/or will suffer as a result of Monahan's breach and/or threatened breach of the 2008 Stock Agreement.

WHEREFORE, Fiserv demands judgment against defendant Monahan and in Fiserv's favor, and further requests the Court to:

(a)     preliminarily and permanently thereafter, enjoin Monahan from breaching the 2008 Stock Agreement, including by (i) contacting any of the clients of Fiserv or any of its affiliates ("Fiserv Group Company") for whom he directly performed any services, had any direct business contact, or whose identity or other client specific information he discovered or gained access to as a result of his access to any Fiserv Group Company's confidential information, for the purpose of soliciting business or inducing such client to acquire any core bank processing product or service (ii) using any Fiserv Group Company's confidential information to solicit, influence or encourage any clients or potential clients of any Fiserv Group Company to divert or direct their business to himself or any other person, association or entity by or with whom he is employed, associated, engaged as agent or otherwise affiliated; or (iii) encouraging, inducing or enticing any employee of any Fiserv Group Company with access to or possession of confidential information of any Fiserv Group Company to leave any Fiserv Group Company's employment; and

(b)     order such other and further relief as the Court may deem just and proper.

## COUNT II

### (Breach of the 2010 Stock Agreement)

63.     Fiserv realleges and incorporates herein the allegations contained in paragraphs 1 through 62 of its Verified Complaint.

64.     Monahan's 2010 Stock Agreement is a valid and enforceable contract.

65.     Monahan has breached and/or threatened to breach the 2010 Stock Agreement.

66.     Fiserv has been, and will continue to be, irreparably damaged and harmed unless Monahan is enjoined from breaching his contractual obligations under the 2010 Stock Agreement.

67.     Fiserv cannot be fully or adequately compensated through monetary damages for the irreparable damage and harm Fiserv has suffered and/or will suffer as a result of Monahan's breach and/or threatened breach of the Agreement.

WHEREFORE, Fiserv demands judgment against defendant Monahan and in Fiserv's favor, and further requests the Court to:

(a)     preliminarily and permanently thereafter, enjoin Monahan from breaching the 2010 Stock Agreement, including by (i) performing duties as or for Jack Henry, or any other Competitor of Fiserv (as that term is defined in the 2010 Stock Agreement), that are the same or similar to the duties performed by him for Fiserv at any time during any part of the 24 month period preceding the termination of his employment with Fiserv; (ii) participating in the inducement of or otherwise encouraging Fiserv employees, clients or vendors to currently and/or prospectively breach, modify, or terminate any agreement or relationship they have or had with Fiserv during any part of the 24 month period preceding the termination of his employment with Fiserv; or (iii) disclosing, using, coping or duplicating, or otherwise permitting the use,

disclosure, copying or duplication of any Confidential Information of Fiserv (as that term is defined in the 2010 Stock Agreement).

(b)     order that Monahan return to Fiserv all Fiserv records, documents and information obtained by or provided to Monahan, or to which Monahan has or had access, or otherwise made, produced or compiled by Monahan during his employment with Fiserv, which contain any confidential information of or relating to Fiserv;

(c)     order that Monahan pay Fiserv the monetary value of any bonuses or stock he received during his employment at Fiserv, including but not limited to the value of the stock he received pursuant to the 2010 Stock Agreement; and

(d)     order such other and further relief as the Court may deem just and proper.

## COUNT III

### (Breach of the 2011 Stock Agreement)

68.     Fiserv realleges and incorporates herein the allegations contained in paragraphs 1 through 67 of its Verified Complaint.

69.     Monahan's 2011 Stock Agreement is a valid and enforceable contract.

70.     Monahan has breached and/or threatened to breach the 2011 Stock Agreement.

71.     Fiserv has been, and will continue to be, irreparably damaged and harmed unless Monahan is enjoined from breaching his contractual obligations under the 2011 Stock Agreement.

72.     Fiserv cannot be fully or adequately compensated through monetary damages for the irreparable damage and harm Fiserv has suffered and/or will suffer as a result of Monahan's breach and/or threatened breach of the Agreement.

WHEREFORE, Fiserv demands judgment against defendant Monahan and in Fiserv's favor, and further requests the Court to:

(a)     preliminarily and permanently thereafter, enjoin Monahan from breaching the 2011 Stock Agreement, including by: (i) performing duties as or for Jack Henry, or any other Competitor of Fiserv (as that term is  defined in the 2011 Stock Agreement) that are the same or similar to the duties performed by him for Fiserv at any time during any part of the 24 month period preceding the termination of his employment with Fiserv; (ii) participating in the inducement of or otherwise encouraging Fiserv employees, clients or vendors to currently and/or prospectively breach, modify, or terminate any agreement or relationship they have or had with Fiserv during any part of the 24 month period preceding the termination of his employment with Fiserv; or (iii) disclosing, using, coping or duplicating, or otherwise permitting the use, disclosure, copying or duplication of any Confidential Information of Fiserv (as that term is defined in the 2011 Stock Agreement).

(b)     order that Monahan return to Fiserv all Fiserv records, documents and information obtained by or provided to Monahan, or to which Monahan has or had access, or otherwise made, produced or compiled by Monahan during his employment with Fiserv, which contain any confidential information of or relating to Fiserv;

(c)     order that Monahan pay Fiserv the monetary value of any bonuses or stock he received during his employment at Fiserv, including but not limited to the value of the stock he received pursuant to the 2011 Stock Agreement; and

(d)     order such other and further relief as the Court may deem just and proper.

<u>**COUNT IV**</u>

**(Breach of the 2012 Stock Agreement)**

73.     Fiserv realleges and incorporates herein the allegations contained in paragraphs 1 through 72 of its Verified Complaint.

74.     Monahan's 2012 Stock Agreement is a valid and enforceable contract.

75.     Monahan has breached and/or threatened to breach the 2012 Stock Agreement.

76.     Fiserv has been, and will continue to be, irreparably damaged and harmed unless Monahan is enjoined from breaching his contractual obligations under the 2012 Stock Agreement.

77.     Fiserv cannot be fully or adequately compensated through monetary damages for the irreparable damage and harm Fiserv has suffered and/or will suffer as a result of Monahan's breach and/or threatened breach of the Agreement.

WHEREFORE, Fiserv demands judgment against defendant Monahan and in Fiserv's favor, and further requests the Court to:

(a)     preliminarily and permanently thereafter, enjoin Monahan from breaching the 2012 Stock Agreement, including by: (i) performing duties as or for Jack Henry, or any other Competitor of Fiserv (as that term is defined in the 2012 Stock Agreement) that are the same or similar to the duties performed by him for Fiserv at any time during any part of the 24 month period preceding the termination of his employment with Fiserv; (ii) participating in the inducement of or otherwise encouraging Fiserv employees, clients or vendors to currently and/or prospectively breach, modify, or terminate any agreement or relationship they have or had with Fiserv during any part of the 24 month period preceding the termination of his employment with Fiserv; or (iii) disclosing, using, coping or duplicating, or otherwise permitting the use,

disclosure, copying or duplication of any Confidential Information of Fiserv (as that term is defined in the 2012 Stock Agreement).

(b)     order that Monahan return to Fiserv all Fiserv records, documents and information obtained by or provided to Monahan, or to which Monahan has or had access, or otherwise made, produced or compiled by Monahan during his employment with Fiserv, which contain any confidential information of or relating to Fiserv;

(c)     order that Monahan pay Fiserv the monetary value of any bonuses or stock he received during his employment at Fiserv, including but not limited to the value of the stock he received pursuant to the 2012 Stock Agreement; and

(d)     order such other and further relief as the Court may deem just and proper.

## COUNT V

### (Breach of the Sales Equity Plan Agreement)

78.     Fiserv realleges and incorporates herein the allegations contained in paragraphs 1 through 77 of its Verified Complaint.

79.     Monahan's Sales Equity Plan Agreement is a valid and enforceable contract.

80.     Monahan has breached and/or threatened to breach the Sales Equity Plan Agreement.

81.     Fiserv has been, and will continue to be, irreparably damaged and harmed unless Monahan is enjoined from breaching his contractual obligations under the Sales Equity Plan Agreement.

82.     Fiserv cannot be fully or adequately compensated through monetary damages for the irreparable damage and harm Fiserv has suffered and/or will suffer as a result of Monahan's breach and/or threatened breach of the Sales Equity Plan Agreement.

WHEREFORE, Fiserv demands judgment against defendant Monahan and in Fiserv's favor, and further requests the Court to:

(a)       preliminarily and permanently thereafter, enjoin Monahan from breaching the Sales Equity Plan Agreement, including by: (i) performing the duties as or for Jack Henry, or any other Competitor of Fiserv (as that term is defined in the Sales Equity Plan Agreement) that are the same or similar to the duties performed by him for Fiserv at any time during any part of the 24 month period preceding the termination of his employment with Fiserv; or (ii) participating in the inducement of or otherwise encouraging Fiserv employees, clients, or vendors to currently and/or prospectively breach, modify, or terminate any agreement or relationship they have or had with Fiserv during any part of the 24 month period preceding the termination of his employment with Fiserv; and

(b)       order such other and further relief as the Court may deem just and proper.

Respectfully submitted,


**DYKEMA GOSSETT PLLC**


By: */s/ Patrick F. Hickey*_____
      Patrick F. Hickey (P36648)
      Lauren M. Phillips (P74102)
      400 Renaissance Center
      Detroit, MI 48243
      (313) 568-6800
      phickey@dykema.com


**Of Counsel:**

**BRYAN CAVE LLP**

      Charles B. Jellinek
      Kimberly A. Mohr
      Laura J. Spencer
      One Metropolitan Square
      211 North Broadway, Suite 3600
      St. Louis, Missouri 63102-2750
      cbjellinek@bryancave.com
      kimberly.mohr@bryancave.com
      laura.spencer@bryancave.com
      Telephone: (314) 259-2000
      Facsimile: (314) 259-2020

ATTORNEYS FOR PLAINTIFF
FISERV, INC.

## VERIFICATION

STATE OF GEORGIA    )
           ) SS.
COUNTY OF DeKalb    )

    I, Brent Jenos, being of lawful age and duly sworn upon my oath, state as follows:

    1.  I am the Senior Vice President, Community Banks and Sales Director for Fiserv Solutions, Inc.

    2.  The facts alleged in the Verified Complaint for Injunctive and Other Relief are based upon matters known personally to me and/or on information provided to me by others, and are correct to the best of my knowledge, information and belief.

    Subscribed and sworn to before me, a Notary Public, on this ___ day of December, 2012.

Notary Public

My Commission Expires:

11/27/2015

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 13, 2012, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notice to all attorneys of record.

**DYKEMA GOSSETT PLLC**

By: */s/ Patrick F. Hickey*
      Patrick F. Hickey (P36648)
      Lauren M. Phillips (P74102)
      400 Renaissance Center
      Detroit, MI 48243
      (313) 568-6800
      phickey@dykema.com